UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CENTER FOR IMMIGRATION STUDIES**, <br><br> Plaintiff, <br><br> v. <br><br> **U.S. CITIZENSHIP AND IMMIGRATION SERVICES**, <br><br> Defendant. | Case No. 23-cv-3491 (CRC) |

## MEMORANDUM OPINION

In July 2023, the Center for Immigration Studies (the "Center") submitted two Freedom of Information Act ("FOIA") requests to the United States Citizenship and Immigration Services ("USCIS" or the "Agency"). One of the requests sought demographic information of Special Immigrant Juvenile Status applicants, including their current non-immigration status. When USCIS failed to timely respond to either request, the Center filed this lawsuit. A few months later—without prompting by the Court—the Agency produced a massive spreadsheet with the requested demographic information. But the spreadsheet listed the applicants' non-immigration statuses as a series of codes (e.g., "EWI") rather than text (e.g., "Entry Without Inspection"). The Center asked USCIS to define the status codes, and after further out-of-court discussions, the Agency supplied a key.

Now, the Center moves for attorney's fees and costs, claiming that it "substantially prevailed" in this litigation by obtaining the information it initially sought. But because there is insufficient evidence that this lawsuit *caused* USCIS to produce the spreadsheet or the status-code key, the Court will deny the Center's motion.

I.  **Background**

This dispute over attorney's fees stems from two FOIA requests that the Center submitted to USCIS in July 2023.  Both requests sought demographic information concerning applicants for Special Immigrant Juvenile Status, which provides an immigration pathway for abused or neglected juveniles.  See 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11.  The first request ("Request 5115") called for information for "each applicant" since 2015, including the applicants' country of citizenship, birth year, zip code, and marital status.  Compl., Ex. 1 (footnote omitted).  Request 5115 also sought certain immigration-related data, including the basis for the applicants' eligibility and their current non-immigration status.  Id.  The second request ("Request 5116") asked for "[a]ll reports, memoranda, or analyses . . . regarding the population of Special Immigrant Juvenile applicants or the Special Immigrant Juvenile program."  Id., Ex. 2 (footnote omitted).  USCIS acknowledged receipt of both requests and placed them in a processing queue.  See id., Ex. 3, 4.

The Agency's internal records show that it screened both FOIA requests shortly after they were submitted.  See Def.'s Opp'n to Mot. for Attorney's Fees and Costs ("Def.'s Opp'n"), Ex. A at 1, 4.  But when the Center inquired about the status of Request 5115 in September 2023, USCIS indicated that the request had not moved forward in the queue.  See Pl.'s Mot. for Attorney's Fees and Costs ("Pl.'s Mot."), Ex. C, D.  The Agency did not provide an estimated completion time.  See id., Ex. D.  When there was still no meaningful progress by November 2023, the Center filed this lawsuit.  See Compl. ¶¶ 11–12.

In February 2024—before the litigation progressed any further—USCIS responded to Request 5115 by producing a large spreadsheet containing thousands of "Special Immigrant

2

Juvenile Receipts" from January 2015 to August 2023.[1]  Pl.'s Mot., Ex. E, G.  One of the spreadsheet's columns listed a series of codes (e.g., "UU" or "ASD") representing the current non-immigration status of the program's applicants.  Declaration of Colin M. Farnsworth ("Farnsworth Decl.") ¶ 5.  In April 2024, the Center asked USCIS to provide "a data dictionary or a key detailing the definitions for each code."  Pl.'s Mot., Ex. H.  The Agency initially declined, stating:

> Column G . . . "reflects each petitioner's current immigration classification that they entered on their petition. The requestor asked for Current Non-Immigrant Status which is what these classifications represent." For a breakdown of the classification codes, USCIS would have to go through the 21,000+ entries to create a record with the codes which is outside the scope of the FOIA and presents an undue burden.

Id., Ex. I.  But after further out-of-court discussions between the parties, USCIS provided a key defining the status codes in September 2024.[2]  Id., Ex. K; Farnsworth Decl. ¶ 9.  The parties engaged in settlement negotiations shortly thereafter.  See Joint Status Report (ECF No. 18) at 1.

In December 2025, the parties reported that they had resolved all substantive differences but could not agree on the issue of attorney's fees and costs.  See Joint Status Report (ECF No. 21) at 1.  The Center thus moved for attorney's fees in March 2025, seeking an award over $51,000.  USCIS opposes any award.

## II. Legal Standards

The Court "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred" in a FOIA case where "the complainant has substantially

---

[1] USCIS responded to Request 5116 on the same day.  See Pl.'s Mot., Ex. F.  That response is no longer at issue in this suit.

[2] For example, "UU" means "Unknown or Not Reported," and "ASD" means "Asylum Denied."  Pl.'s Mot., Ex. K.

prevailed." 5 U.S.C. § 552(a)(4)(E)(i).  To recover fees and costs, a FOIA plaintiff must be both *eligible* for and *entitled* to such an award.  See Brayton v. Off. of the U.S. Trade Representative, 641 F.3d 521, 524 (D.C. Cir. 2011).  The eligibility prong determines whether a plaintiff "may" receive fees.  Id. (citation omitted).  A plaintiff is eligible for an award if it (1) obtains relief through a judicial order, or (2) shows that the lawsuit "caused a change in the agency's position regarding the production of requested documents."  Grand Canyon Tr. v. Bernhardt, 947 F.3d 94, 98 (D.C. Cir. 2020); see 5 U.S.C. § 552(a)(4)(E)(ii).

If the plaintiff is eligible for a fee award, courts proceed to the entitlement prong, which assesses whether a plaintiff "should" receive fees.  Brayton, 641 F.3d at 524.  To determine entitlement, courts consider "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding of the requested documents."  Davy v. CIA, 550 F.3d 1155, 1159 (D.C. Cir. 2008).  No one factor is dispositive, id., and "[t]he sifting of those criteria over the facts of a case is a matter of district court discretion."  Tax Analysts v. DOJ, 965 F.2d 1092, 1094 (D.C. Cir. 1992).

If a FOIA plaintiff is both eligible for and entitled to an award, the Court must assess the reasonableness of the requested fees.  While precedent can be a helpful guide in conducting the assessment, this analysis is "necessarily somewhat imprecise."  Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1323 (D.C. Cir. 1982) (per curiam).  Thus, courts should "exercise their discretion as conscientiously as possible, and state their reasons as clearly as possible."  Copeland v. Marshall, 641 F.2d 880, 893 (D.C. Cir. 1980) (en banc).

**III. Analysis**

This case begins and ends with the Center's eligibility for attorney's fees. The Center claims that it "substantially prevailed" in this litigation—and therefore is eligible for fees—because (1) it obtained the requested records more quickly than it would have absent litigation, and (2) it obtained more records than what the Agency originally produced. Neither argument carries the day.

    A. "Accelerating" the Production of Documents

The Center first claims that it substantially prevailed in this litigation because it "induced [USCIS] to produce responsive records faster than it would have outside of litigation." Pl.'s Mot. at 7. In other words, its lawsuit purportedly caused a "sudden acceleration" in the Agency's processing of the two FOIA requests. See Terris, Pravlik & Millian, LLP v. CMS, 794 F. Supp. 2d 29, 38 (D.D.C. 2011).

As noted above, a plaintiff "substantially prevailed" in FOIA litigation if it obtained relief by either (1) "a judicial order, or an enforceable written agreement or consent decree," or (2) "a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii). Since the Court never ordered relief to the Center, it must establish its fee eligibility via the latter provision, known as the "catalyst theory." See Am. Wild Horse Campaign v. BLM, No. 22-cv-3061 (CRC), 2024 WL 3967256, at *2 (D.D.C. Aug. 26, 2024). Under the catalyst theory, a plaintiff is eligible for fees if "the institution and prosecution of the litigation cause[d] the agency to release the documents obtained during the pendency of the litigation." Harvey v. Lynch, 178 F. Supp. 3d 5, 7 (D.D.C. 2016) (alteration in original) (quoting Church of Scientology of Cal. v. Harris, 653 F.2d 584, 587 (D.C. Cir. 1981)), aff'd sub nom. Harvey v. Sessions, No. 16-5200, 2017 WL 4220323 (D.C. Cir. July 14, 2017).

That is, the plaintiff must show that its lawsuit was "necessary to ensure the agency's compliance with FOIA." Elec. Priv. Info. Ctr. v. DHS, 218 F. Supp. 3d 27, 41 (D.D.C. 2016); see also Grand Canyon Tr., 947 F.3d at 97 ("[T]he plaintiff has the burden of showing 'that it is more probable than not that the government would not have performed the desired act absent the lawsuit.'") (citation omitted)).

An agency's "unusually long" pre-suit delay in responding to a FOIA request "might give rise to the inference that the agency forgot about, or sought to ignore" the request. Harvey, 178 F. Supp. 3d at 8; see Am. Wild Horse Campaign, 2024 WL 3967256, at *3. In that case, an agency's "sudden acceleration" in the processing of the request after the plaintiff files a lawsuit "may lead to the conclusion that the lawsuit substantially caused the agency's compliance with FOIA." Elec. Priv. Info. Ctr., 218 F. Supp. 3d at 41; see also Terris, 749 F. Supp. 2d at 38 ("Sudden acceleration in th[e] process resulting in a disclosure made after a lawsuit is filed might, in a given case, lead a court to conclude that, despite the government's protestation, the filing of the lawsuit was the real reason for that acceleration."). To prevail under this variant of the catalyst theory, a plaintiff must establish that (1) "the agency decided against disclosure or was engaging in an unexplained delay before the filing of the lawsuit," and (2) "the agency did in fact accelerate its response to the FOIA request because of the lawsuit." First Look Media Works, Inc. v. U.S. Agency for Glob. Media, No. 20-cv-3499 (TJK), 2024 WL 4262773, at *4 (D.D.C. Sept. 23, 2024).

The Center fails to make either showing. First, the Agency's initial delay in processing the FOIA requests was neither unexplained nor unusually long. The Center submitted its FOIA requests in July 2023. By the time the Center filed this lawsuit in November 2023, it had not received a response or an estimated time of completion. While this delay exceeded FOIA's

prescribed deadline, see 5 U.S.C. § 552(a)(6)(A)(i), "some amount of delay in excess of the statutory limit is, regrettably, a common feature of the FOIA process," Zynovieva v. U.S. Dep't of State, No. 19-cv-3445 (RDM), 2023 WL 2755599, at *6 (D.D.C. Mar. 31, 2023) (noting that a six-month processing delay did not "give rise to an inference that the [agency] forgot about, or sought to ignore" the FOIA request (citation and internal quotation marks omitted)). Indeed, the Agency informed the Center that it processes FOIA requests on a "first in, first out basis," and as of September 2023, there were more than 250 requests ahead of Request 5115. See Pl.'s Mot., Ex. D. The Agency's internal records also indicate that it did not forget or ignore Request 5115, as it conducted a search for responsive records in August 2023. See Def.'s Opp'n, Ex. A at 1. While USCIS could—and perhaps should—have done more to explain its delay in processing the FOIA requests, the Center has not met its burden of showing that initiating this litigation caused the Agency to release documents it would not have otherwise. See Am. Wild Horse Campaign, 2024 WL 3967256, at *3 (holding that the agency's failure to communicate with the plaintiff was "regrettable" but did not "overcome its assurances that it intended to process [the plaintiff's] request in the order received and experienced delays due to backlog"); Zynovieva, 2023 WL 2755599, at *6–7 (recognizing that it is the plaintiff's "burden to show that it is more likely than not that [its] litigation caused the release of documents, not the [agency's] burden to prove otherwise"); Gov't Accountability & Oversight v. SEC, No. 23-cv-3268 (RC), 2024 WL 4828107, at *4 (D.D.C. Nov. 19, 2024) (finding "no reason to think" that the agency would have withheld the requested documents absent a lawsuit, in part because the agency began processing the request before the plaintiff filed the complaint (citation omitted)).

Second, there is insufficient evidence that USCIS "suddenly accelerated" its processing of the FOIA requests after the Center initiated this litigation. While the Center filed its

complaint in November 2023, USCIS did not release the responsive records until three months later, in February 2024.  Given that timing, it seems "more likely . . . that the documents would have been processed in the same manner, with the same result, regardless of whether litigation was filed." Zynovieva, 2023 WL 2755599, at *6 (citation omitted) (noting that the agency took "several more months to make its production" after the plaintiff filed the complaint); Am. Wild Horse Campaign, 2024 WL 3967256, at *3 (records not released until three months after litigation began); First Look Media Works, 2024 WL 4262773, at *5 (documents produced more than two months after the plaintiff filed the complaint).

      To bolster its claim that this litigation caused USCIS to act more quickly, the Center points to still another FOIA request that it submitted to the Agency in September 2023.  See Pl.'s Mot., Ex. L.  That request—which did not yield any litigation—was not resolved for thirteen months.  See id., Ex. N.  Because Request 5115 and Request 5116 were pending for only seven months, the Center says, this litigation caused the Agency to "change its conduct" by accelerating its response time.  Pl.'s Mot. at 8.  But this one-to-one comparison is unconvincing, especially because of the considerable variance in FOIA request response times.  While the Center's argument may have been more persuasive if it showed that the response times for Request 5115 and Request 5116 were shorter than the Agency's *average* response time for comparable FOIA requests, see Gov't Accountability & Oversight, 2024 WL 4828107, at *4, the Center cannot satisfy its burden with a single cherrypicked comparator.

       "Congress did not enact the fee-shifting provision of FOIA to punish agencies for their slowness in processing FOIA requests, but to reward plaintiffs whose filing of lawsuits alters the government's slowness and brings about disclosure." Terris, 794 F. Supp. 2d at 38.  In this case, the Center has failed to demonstrate that its lawsuit prompted "a sudden burst of alacrity" by

8

USCIS in producing the requested documents.  Id.  Thus, the timing of the Agency's disclosure alone does not show that the litigation "caused a change in the agency's position regarding the production of the requested documents."  Grand Canyon Tr., 947 F.3d at 98.

      B.  Production of the Non-Immigrant Status-Code Key

The Center also claims eligibility for attorney's fees and costs because it obtained a key defining the non-immigrant status codes in the spreadsheet that USCIS produced in response to Request 5115.  USCIS initially declined the Center's request for a key because it "would have to go through the 21,000+ entries to create a record with the codes."  Pl.'s Mot, Ex. I.  But after further discussions between the parties, the Agency agreed to provide a key.  See id., Ex. K.  Because USCIS "made a voluntary change to its position" on whether to produce the key, the Center contends that it "substantially prevailed" in this litigation.  Pl.'s Mot. at 9; Farnsworth Decl. ¶¶ 9–10.

     Recall that "the catalyst analysis is all about causation."  Conservation Force v. Jewell, 160 F. Supp. 3d 194, 205 (D.D.C. 2016); see CREW v. DOJ, 83 F. Supp. 3d 297, 303 (D.D.C. 2015) ("Recovery under the catalyst theory . . . turns on causation."); Harris, 653 F.2d at 587 ("Our cases have established that [the "substantially prevailed" inquiry] is largely a question of causation[:] did the institution and prosecution of the litigation cause the agency to release the documents obtained during the pendency of the litigation?").  In other words, the plaintiff must show that "the prosecution of the action could reasonably be regarded as necessary to obtain the information . . . and that a causal nexus exists between the action and the agency's surrender of that information."  Weisberg v. DOJ, 745 F.2d 1476, 1496 (D.C. Cir. 1984) (alteration in original) (quoting Cox v. DOJ, 601 F.2d 1, 6 (D.C. Cir. 1979)).  The plaintiff has the burden of

showing that the "necessary causal nexus" exists. Conservation Force, 160 F. Supp. 3d at 205; see Pyramid Lake Paiute Tribe of Indians v. DOJ, 750 F.2d 117, 120–21 (D.C. Cir. 1984).

The Center has not carried that burden. It first requested a key for the non-immigrant status codes in April 2024, five months *after* initiating this litigation. See Pl.'s Mot., Ex. H. The parties engaged in "back-and-forth correspondence" over the next several months, Farnsworth Decl. ¶ 9, but the Court was neither apprised of nor involved in the substance of those discussions, see, e.g., Joint Status Report (ECF No. 15); Joint Status Report (ECF No. 16); Joint Status Report (ECF No. 17). And, as both parties concede, USCIS voluntarily agreed to produce a key in September 2024, again without the Court's involvement. See Farnsworth Decl. ¶ 9. The Agency represents that the key—which "did not exist in the form in which it was disclosed before the litigation"—was "prepared solely to aid in settlement discussions" and part of a "a good-faith effort to resolve this litigation without burdening the Court." Def.'s Opp'n at 10; see also Pl.'s Reply in Supp. of Mot. for Attorney's Fees, Ex. R. In short, the Agency did not "defend" its initial decision to not provide a key through this litigation, but instead "conferred" with the Center to address its concerns about interpreting the non-immigrant status codes. Env't Integrity Project v. EPA, 316 F. Supp. 3d 320, 327 (D.D.C. 2018). Thus, "the connection between this suit and [the Agency's] release of [the key] is too attenuated to indicate that [the Center] substantially prevailed." Id.; see also Gov't Accountability & Oversight, 2024 WL 4828107, at *4–5 (concluding that an agency's decision to release a record after previously withholding it—without evidence that the re-release was *caused* by the litigation—was insufficient to show that the plaintiff substantially prevailed).

Perhaps the Center could have established causation had USCIS elected to release the key after researching and preparing a brief in this case. See, e.g., Jud. Watch, Inc. v. DOJ, 878 F.

Supp. 2d 225, 232–33 (D.D.C. 2012) (noting that a production of records made "in the course of preparing" a motion for summary judgment was evidence that "the records would not have been released but for th[e] litigation"). It also could have pointed to evidence suggesting a causal relationship between a litigation filing and the Agency's decision to produce the requested information. See, e.g., Dorsen v. SEC, 15 F. Supp. 3d 112, 119–20 (D.D.C. 2014) (holding that the plaintiff substantially prevailed in the litigation because the agency released originally-withheld records only one day after it received the complaint); Am. Immigr. Council v. DHS, 82 F. Supp. 3d 396, 403–04 (D.D.C. 2015) (concluding that the plaintiff substantially prevailed because the agency changed its position and released documents in response to the plaintiff's summary judgment briefing). But the Center has not presented any "hard" evidence—temporal or otherwise—that "the litigation *itself* elicited an event through which [the Center] obtained relief." Conservation Force, 160 F. Supp. 3d at 206, 208 (emphasis added). Thus, the Court cannot conclude that the Center's lawsuit was the catalyst for the Agency's production of the non-immigrant status-code key. See id. at 202 ("Ultimately, it is the plaintiff's burden to show that the catalyst pathway applies; if nothing else, this at least means that equipoise on the question of causation will not do." (citations omitted)). [3]

---

[3] A contrary ruling would also discourage agencies from responding to a plaintiff's follow-up inquiries about a records production. For example, if a plaintiff was necessarily eligible for attorney's fees whenever an agency produced documents and subsequently "sought to address [the plaintiff's] concerns" with the production out of court, then the agency would be incentivized to "defend" its initial disclosure through litigation rather than engage in good-faith discussions that may obviate the need for judicial intervention. Env't Integrity Project, 316 F. Supp. 3d at 327. Here, USCIS should not be faulted for taking the latter approach, as it never defended its position in court or prompted any briefing, but instead "voluntarily created" the status-code key to "facilitate [the Center's] understanding" of the requested spreadsheet. Def.'s Opp'n at 11.

### IV. Conclusion

The Center has failed to demonstrate that it substantially prevailed in this litigation, so it is not eligible to recover under FOIA's cost-shifting provision. The Court will therefore deny Plaintiff's Motion for Attorney's Fees and Costs. A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: December 2, 2025